IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDY BOYSEN, an individual, on his own behalf and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>WALGREEN CO.,<br><br>    Defendant.<br>_____/ | No. C 11-06262 SI<br><br>**ORDER GRANTING DEFENDANT WALGREEN CO.'S MOTION TO DISMISS** |

On May 7, 2012, defendant Walgreen Co. moved to dismiss plaintiff Randy Boysen's claims. Walgreen Co.'s motion is currently scheduled for hearing on July 20, 2012. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and hereby VACATES the hearing. For the reasons set forth below, the Court GRANTS defendant's motion to dismiss.

**BACKGROUND**

On December 13, 2011, plaintiff Randy Boysen filed this putative class action asserting four causes of action against Walgreen Co. Plaintiff's claims relate to defendant's alleged failure to disclose the presence of "material and significant" levels of arsenic and lead in its "100% Apple Juice" and "100% Grape Juice." Compl. ¶¶ 1-4. Plaintiff alleges that defendant's omissions as to the presence of these toxins are false and misleading, especially in light of the juice labels' affirmative representations

that the products are healthy and safe. *Id.* ¶ 5. Plaintiff claims that he and other consumers would not have purchased the juices had they known the products contained lead and arsenic. Compl. ¶¶ 29, 50.

Plaintiff's claims are substantially similar to allegations brought by different plaintiffs in a series of unrelated actions against producers of juice and other fruit products. *See In re Fruit Juice Products Mktg. and Sales Practices Litig.,* 831 F.Supp.2d 507 (D. Mass. 2011). Those actions were consolidated by the Multi District Litigation Panel and heard before Judge Ponsor in the District of Massachusetts.[1] On December 21, 2011, Judge Ponsor dismissed plaintiffs' claims, finding that they had not established any injury in fact and therefore lacked standing. *Id.* at *510.

To support its claim that Walgreen's apple and grape juices contain significant levels of lead and arsenic, plaintiff cites the FDA's regulations regarding the maximum parts per billion ("ppb") of these toxins in bottled water. Compl. ¶ 17, 20. According to the FDA, bottled water can contain no more than 5 ppb of total lead, and 10 ppb of total inorganic arsenic. *Id.*, *citing* 21 C.F.R. 165.110(b)(4)(iii)(A). Plaintiff alleges that by contrast, defendant's "100% Grape Juice" contains up to 20.48 ppb of inorganic arsenic, and 15.9 ppb of total lead; and that its "100% Apple Juice" contains up to 6.94 ppb of total lead. *Id.* ¶ 27.

In response, defendant proffers evidence showing that the FDA has monitored the presence of lead and arsenic in fruit juice, raw fruit and vegetables since 1991 as part of its Total Diet Study. Def. RJN, Ex. B, FDA, *Total Diet Study - Analytical Results* (February 2012).[2] Defendant asserts that in

---

[1] On March 9, 2012, Walgreen Co. petitioned the MDL Panel to transfer this case to the existing MDL, *In re Fruit Juice Products,* or alternatively, to form a new MDL with Wal-Mart Stores, Inc., a defendant in a similar action pending in the Eastern District of Texas. Dkt. 31, Ex. A. By that point, Judge Ponsor had already dismissed the MDL before him. The MDL Panel agreed that the present action was similar to those consolidated in *In re Fruit Juice Products*, and noted the district courts may use Judge Ponsor's decision as a guide, but concluded that consolidating these cases would not be the most efficient approach at the time.

[2] Defendant has requested this Court to take Judicial Notice ("RJN") of several exhibits submitted by defendant. Plaintiff objects, particularly to defendant's characterizations of the statements in those exhibits. Plaintiff does not object to the existence or veracity of the documents. In considering a motion to dismiss, the court may take judicial notice of matters of public record outside the pleadings. *See MGIC Indemn. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986). The Court takes notice of Exhibits A-F as part of the public record. However, the Court does not rely on or take as fact defendant's interpretation of these Exhibits. *See e.g.,* Pls. Obj. to RJN at 1, quoting Def. Mot. at 1, ("Drinking the fruit juice sold by Walgreens exposes someone to the same level of lead as eating a peach and the same level of arsenic as eating a slice of cantaloupe.").

2011, the FDA tested commercial fruit juices for the presence of lead, and concluded the levels were safe for consumption under current guidelines. RJN, Ex. C., *citing,* FDA, *Reported Findings of Low Levels of Lead in Some food Products Commonly Consumed by Children* (Nov. 29, 2011). Defendant also points to a separate FDA statement concluding that the levels of arsenic found in apple juice were safe. RJN, Ex. E., *citing* FDA, *Questions & Answers: Apple Juice and Arsenic* (Dec. 16, 2011).

Plaintiff maintains that Walgreen Co. misleadingly markets the juices as safe and healthy despite the presence of lead and arsenic. To support this claim, plaintiff points to the "Heart Healthy" logo on the grape juice product itself, and affirmations on defendant's website that the grape juice "promote[s] a healthy heart," has more anti-oxidant power than orange juice, and that eight ounces is equivalent to three servings of fruit. Compl. ¶ 25. Plaintiff maintains that the apple juice label also obscures the significant health risk associated with the ingestion of lead and arsenic: defendant's website states that the apple juice "contains 100% juice," is vegan, has vitamins to support a healthy immune system, does not contain any artificial preservatives, flavorings or colors, and is "[q]uality guaranteed." *Id.* ¶ 26.

Plaintiff has alleged violations under the Unfair Competition Law, Cal. Bus. Prof. Code, Sections 17200, *et seq.*, "Unfair, Unlawful and Deceptive Business Practices," and Sections 17500 *et seq.*, "False or Misleading Advertising," breach of implied warranty and unjust enrichment. Plaintiff expressly disclaims any physical harm resulting from consumption of the juices, but rather asserts that by purchasing the juices he suffered economic injury for which he seeks redress. Compl. ¶¶ 40-75, A-G.

On May 7, 2012, defendant moved to dismiss plaintiff's claims. Plaintiff filed an opposition to defendant's motion on June 4, 2012; Walgreen Co. replied on June 18, 2012.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge a federal court's jurisdiction over the subject matter of the complaint. *See* Fed. R. Civ. Pro. 12(b)(1). The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994) (citation omitted). A complaint will be dismissed if, looking at the complaint

3

as a whole, it appears to lack federal jurisdiction either "facially" or "factually." *Thornhill Pub'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). When the complaint is challenged for lack of subject matter jurisdiction on its face, all material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Indus. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). In deciding a Rule 12(b)(1) motion which mounts a factual attack on jurisdiction, "no presumption of truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Mortensen v. First Fed. Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. See *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. See *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, a district court should grant a motion to dismiss when plaintiffs have not pleaded "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court need not accept as true conclusory allegations, unreasonable inferences, legal characterizations, or unwarranted deductions of fact contained in the complaint. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-755 (9th Cir. 1994). "[W]here the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F. 3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

4

**DISCUSSION**

Defendant moves to dismiss the complaint on several grounds, including (1) that plaintiff lacks Article III standing, (2) that the claims are preempted by federal law, and (3) that plaintiff fails to state a claim on which relief can be granted. The Court finds that plaintiff has not established standing to bring this suit, and therefore finds it unnecessary to reach defendant's other theories.

To establish standing, a plaintiff must show: "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008). A concrete injury is one that is "distinct and palpable . . . as opposed to merely abstract." *Schmier v. U.S. Court of Appeals for 9th Circuit*, 279 F.3d 817, 821 (9th Cir. 2009). Claims brought under California's UCL must satisfy federal standing requirements under Article III as well. *See Birdsong v. Apple*, 590 F.3d 955, n. 4 (9th Cir. 2009) (*citing Cantrell v. City of Long Beach*, 241 F.3d 674, 683 (9th Cir. 2001) (holding that a party asserting state law claims in federal court "must meet the stricter federal standing requirements of Article III.").

The Multi District Litigation Panel consolidated a group of substantially similar claims to those brought by plaintiff in *In re Fruit Juice Products Marketing and Sales Practices* (the "MDL"), which was heard before Judge Ponsor in the District Court of Massachusetts. 831 F. Supp. 2d 507 (D. Mass. 2011). There, as here, plaintiffs complained of levels of lead in commercial fruit juice products.[3] To establish standing, plaintiffs there argued that if they had known the products contained lead, they would not have purchased them, and thus suffered an economic injury.[4] As here, plaintiffs did not allege that they or anybody else had actually been injured by the fruit juice, and the FDA had found "at least some of these products do not pose an unacceptable risk to human health." 831 F. Supp. 2d at 511. The court

---

[3] Plaintiffs there did not allege presence of arsenic in the fruit juice.

[4] Plaintiffs in the MDL had a second theory of standing – that the lead in defendants' products posed a health risk and that, by consuming the products, they placed themselves and their children at risk of future harm from lead poisoning. 831 F. Supp. 2d at 510. Judge Ponsor rejected this theory as well, on the grounds that any harm alleged was too speculative to constitute injury in fact. *Id.* Plaintiff here does not raise this theory.

5

dismissed the case for lack of standing on the grounds that plaintiffs had failed to establish injury in fact. The court held:

> Because Plaintiffs are unable to show that any actual harm resulted from consumption of the fruit juice products, their allegation of "economic" injury lacks substance. The fact is that Plaintiffs paid for fruit juice, and they received fruit juice, which they consumed without suffering harm. The products have not been recalled, have not caused any reported injuries, and do not fail to comply with any federal standards. The products had no diminished value due to the presence of the lead. Thus, Plaintiffs received the benefit of the bargain, as a matter of law, when they purchased these products.

831 F. Supp. 2d at 512.

In so holding, the MDL court relied on a number of cases that have rejected similar theories of standing on economic injury grounds in products liability cases. *Id.* (*citing Rivera v. Wyeth-Ayerst Labs*, 283 F.3d 215 (5th Cir. 2002) (holding that plaintiffs, who purchased an anti-inflammatory drug that was later withdrawn from the market because of its potential to cause liver damage, lacked standing because they did not claim that they were harmed by using the drug); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003) (dismissing complaint on standing grounds where defendant deceptively advertised a drug as providing twelve-hour pain relief with little risk of addiction because plaintiffs did not allege that the drug failed to provide them with effective pain relief or that they suffered personal injuries from ingesting the drug)).

One set of cases relied on by the MDL court were the so-called "lipstick cases," wherein plaintiffs brought claims against manufacturer L'Oreal for selling lipstick that allegedly contained lead. *See Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257 (3d Cir. 2010), aff'g No. 07-CV-5588, 2008 U.S. Dist. LEXIS 59024 (D.N.J. July 29, 2008); *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954 (N.D. Ill. 2008). The lipstick plaintiffs attempted to establish standing by arguing that had they known that the lipstick contained lead, they would not have purchased the products, and thus suffered economic injury. Again, as here, plaintiffs did not allege that they had been injured, or that levels of lead violated FDA standards for those products. *Koronthaly*, 2008 U.S. Dist. LEXIS 59024 at *5. In *Frye*, the Northern District of Illinois dismissed on grounds that plaintiff failed to allege any actual damages as required by the Illinois Consumer Fraud and Deceptive Practices Act, finding dispositive the fact that plaintiff "does not allege that she would not have purchased lipstick, that she would have purchased cheaper lipstick, or that the lipstick in question had a diminished value because of the lead. Simply put,

6

there is no allegation that the presence of lead in the lipstick had any observable economic consequence." 583 F. Supp. 2d at 958. The District Court in *Koronthaly* dismissed on standing grounds, noting that "[p]laintiff bought lipstick and used the lipstick, only complaining that the lipstick's levels of lead are unsatisfactory to her." *Id.* The Third Circuit affirmed, adding that, "Koronthaly's argument that she was misled into purchasing unsafe lipstick products is belied by the FDA's report finding that the lead levels in the Defendants' lipsticks were not dangerous and therefore did not require warnings." 347 F. App'x at 259. The court concluded that plaintiff failed to allege "that she received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect," and, consequently, "Koronthaly has not demonstrated a concrete injury in fact." 347 F. App'x at 259.

Plaintiff argues that a different result is warranted here. Plaintiff argues that the MDL is inapposite because this action contains different defendants, different state law claims, and "different facts concerning the levels of lead or arsenic present in the different defendants' juices." Pl.'s Opp. at 2. Specifically, plaintiff argues that Judge Ponsor relied on the fact that the MDL plaintiffs "made no allegations as to the amount of lead actually in Defendant's products, have not claimed that any particular amount in the products is dangerous," and did not allege the juice "fail[ed] to comply with any federal standards." Pl.'s Opp. at 6 (*citing In re Fruit Juice Products Mktg. and Sales Practices Litig.*, 831 F.Supp.2d 507 (D. Mass. 2011)). Plaintiff argues that by contrast, he has alleged Walgreen's grape juice and apple juice contain specific levels of arsenic and lead that exceed a federal regulation governing the permissible amounts of those toxins in bottled water. Compl., ¶¶ 17-23. Plaintiff also argues that Judge Ponsor's ruling "did not consider, and is inconsistent with, California law regarding standing in false advertising cases." Pl.'s Opp. at 6 (*citing Degelmann v. Advanced Medical Optics, Inc.*, 659 F.3d 835 (2011) (reversing a district court's dismissal for lack of standing where plaintiffs purchased contact lens solution that was later recalled due to high incidence of infection, though plaintiffs themselves suffered no such infection)).

The Court disagrees with plaintiff, and finds that the same outcome reached by Judge Ponsor is warranted here. Regarding plaintiff's first argument, the fact that a different defendant is being sued and an additional chemical (arsenic) is alleged is not a meaningful difference with respect to the legal

7

question of standing. Nor does the presence of California UCL claims, which have their own standing requirements, excuse plaintiff from the requirement of establishing Article III standing. *See Birdsong v. Apple*, 590 F.3d 955, n. 4 (9th Cir. 2009) ("In addition to meeting the UCL's standing requirements, the plaintiffs must also satisfy the federal standing requirements under Article III.").

Nor is plaintiff's standing claim meaningfully distinguished from the MDL by his allegation that specific levels of arsenic and lead exceed a federal regulation governing permissible amounts of toxins in bottled water. Plaintiff does not allege that the toxin levels surpassed regulations regarding the product at issue, fruit juices, likely because the levels fall within the FDA advisory guideline levels for fruit juices.[5] *See* RJN, Exs. A (Guidance for Industry: Juice HACCP Hazards and Controls Guidance), D (FDA Hazard Assessment and Level of Concern - Pear Juice). While the FDA has issued no formal regulations, it has provided guidance to fruit juice processors that lead quantities should not exceed 50 ppb. RJN, Ex. A (Guidance for Industry: Juice HACCP Hazards and Controls, Mar. 3, 2004).[6] An FDA analysis on arsenic in pear juice products states that products containing over 23 ppb of inorganic arsenic would represent a potential health risk. RJN, Ex. D (Hazard Assessment and Level of Concern -

---

[5] The reason that there are different guidance levels for bottled water and fruit juice is suggested by the FDA's "Hazard Assessment and Level of Concern – Pear Juice," which states that "Even though arsenic concentrations [constituting levels of concern for fruit juices] are 5 and 2.3 time higher [than bottled water], respectively, for average and 90th percentile consumers, juice consumption levels (221 and 449 ml/day, respectively) are correspondingly lower than drinking water intake (1-2 L/day)." RJN, Ex. D.

[6] "Based upon a recent toxicological assessment for lead carried out by the Joint WHO/FAO Expert Committee on Food Additives, the Codex Alimentarius Commission, an international food standards organization that establishes safe levels for the protection of consumers, has recently established a maximum level of 50 ppb for lead in ready-to-drink fruit juices, including fruit nectars that are in international trade, to protect the public. FDA concurs with this recent assessment that lead levels in juice above 50 ppb may constitute a health hazard, and FDA may in the future establish an action level for lead in juice at levels above 50 ppb." *Id*.

8

Pear Juice, Apr. 8, 2008). Plaintiff alleges levels of 20.48 ppb inorganic arsenic and 15.9 ppb of total lead in the grape juice, and 6.94 ppb of lead in the apple juice, all below the FDA's guidance levels.[7]

Moreover, the FDA has issued reports stating that the levels of lead and arsenic found in juice products such as defendant's are safe. *See* RJN, Ex. C ("Reported Findings of Low Levels of Lead in Some Food Products Commonly Consumed by Children") (stating that "[a]lmost all the products FDA tested contained a small amount of lead, but in each case the level found was below FDA's current tolerable intake levels intake levels for lead"); RJN, Ex. E. (Questions and Answers: Apple Juice and Arsenic) (noting that the FDA "has been testing for arsenic in apple juice and other fruit juices for decades as part of FDA program that look for harmful substances in food" and concluding that "the very low levels detected during our analysis are not a public health risk and the juice products are safe for consumption."). Plaintiff does not allege or otherwise assert in his opposition to the instant motion that these conclusions are inapplicable to defendant's products, nor that defendant's products exceed FDA guidelines for toxins in fruit juices. Plaintiff's allegation that the toxin levels in juice products surpass guideline levels for a different product – bottled water – does not distinguish his complaint from that in the MDL. As there, plaintiff has failed to allege noncompliance with *applicable* federal standards.

Nor does Ninth Circuit case law save plaintiff's claim. In *Degelmann,* the case relied on most heavily by plaintiff, the plaintiffs brought claims against the maker of a contact lens solution after it had been recalled by the FDA following a report by the U.S. Center for Disease Control and Prevention ("CDC") that the product was associated with a seven-fold increase of a serious eye infection. 659 F.3d at 839. While the plaintiffs themselves had not contracted the infection, they alleged they suffered economic injury by purchasing a product that did not perform as advertised by defendant. In reversing the district court's dismissal on standing grounds, the Ninth Circuit held that plaintiffs had sufficiently plead economic injury, finding they had been "deceived into purchasing a product that did not disinfect

---

[7] Plaintiff does allege that the grape juice contains 24.7 ppb of "total arsenic." The FDA guidance materials do not address maximum levels of total arsenic, only inorganic arsenic. An FDA resource entitled "Questions and Answers: Apple Juice and Arsenic" states the likely reason: "There are two types of arsenic: organic and inorganic: [T]he inorganic forms of arsenic are the harmful forms, while the organic forms of arsenic are essentially harmless." However, it notes that "some scientific studies have shown that two forms of organic arsenic found in apple juice, dimethlarsinic acid (DMA) and monomethlyarsinic acid (MMA), may also be a health concern." If plaintiff chooses to amend his complaint and can plausibly allege that the total level of arsenic surpasses regulatory safety levels, a different analysis may be warranted.

9

as well as it represented. Had the product been labeled accurately, they would not have been willing to pay as much for it as they did, or would have refused to purchase the product altogether." *Id.* at 840.[8] *Degelman* is distinguishable from the instant case in that the plaintiffs supported their claims of economic injury with plausible allegations that the product actually performed at a lower level than comparable products and less well than advertised. The plaintiffs pointed to the recall and the CDC report that use of the defendant's disinfectant was associated with an increase in serious eye infection. The Ninth Circuit found dispositive that plaintiffs had relied on defendant's misrepresentations about the disinfectant power of the product and had paid more in reliance on that representation, thereby establishing injury in fact. Plaintiff Boysen makes no such claim that the juices at issue were unfit for their intended use, i.e. consumption, and therefore has not demonstrated he has "lost money or property" sufficient to establish injury. As in *Koronthaly,* and unlike *Degelman*, plaintiff here failed to allege that he received a "product that failed to work for its intended purpose or was worth objectively less than what one could reasonable expect." *Koronthaly*, 374 F. App'x at 259.

Instead, Judge Wilken's decision in *Herrington v. Johnson & Johnson Consumer Companies, Inc.,* 2010 WL 3448531 (N.D. Cal. 2010) is on point. There, plaintiffs brought claims under the UCL, FAL and breach of implied warranty against various manufacturers of bath products for children, alleging they contained "probable carcinogens and other unsafe substances." *Id.* at *1. As here, plaintiffs sought standing on economic injury grounds, alleging that they would not have purchased the products had they known of the presence of contaminants. *Id.* at *4. The court found that plaintiffs lacked standing to sue, on the grounds that plaintiffs did not plead a distinct risk of harm from a defect in defendants' products that would make such an economic injury cognizable. *Id.* at *4. While plaintiffs alleged facts that suggested the chemicals *themselves* may be carcinogenic, they did not allege that the products made by defendants were unsafe or unfit for their intended use. *Id.* at *4-5.

The same is true here. Plaintiff has plead that arsenic and lead are harmful toxins, and that the products contain those toxins, but he does not expressly allege that the levels of lead and arsenic contained in defendant's juices are likely to cause physical harm. The complaint alleges that defendants

---

[8]The *Degelman* court affirmed dismissal of the plaintiffs complaint, however, on preemption grounds. *Id.* at 842.

10

failed to "disclose the presence of lead or arsenic, or the significant health concerns associated with ingestion of lead or arsenic," but does not expressly allege that the levels present in defendant's juice tend to cause physical harm. Compl. ¶ 25. As in *Herrington*, "[p]laintiffs have not plead facts that tend to show such a threat of physical harm." *Id.* at *5.

Without any meaningful distinctions from the MDL, the Court agrees with Judge Ponsor's analysis and adopts his conclusion. As there, plaintiff does not allege that the products caused him any physical injury. He does not allege that any person has ever been injured by the products, nor does he expressly allege that consumption of the products may cause physical harm. He does not allege that the products violate FDA guidelines for fruit juices. Unlike in *Degelman*, he does not allege that the products function less well than advertised, or that a recall occurred. He does not allege that had defendant's juice been differently labeled, he would have purchased an alternative juice.[9] Put simply, plaintiff only alleges that he purchased and consumed the fruit juices, but that the levels of lead and arsenic in defendant's product were unsatisfactory to him. *See Koronthaly*, 2008 U.S. Dist. LEXIS, at *5. The Court agrees with the MDL court that this is not sufficient to establish Article III injury in fact. Defendant's motion to dismiss is therefore GRANTED.

///

---

[9] In fact, it appears from the number of defendants in the MDL, and the judicially noticed FDA reports, that most if not all consumer fruit juices contain levels of lead and arsenic. *See In re Fruit Juice Products Mktg. and Sales Practices Litig.*, 831 F.Supp.2d 507, 508-9 (D. Mass. 2011) (suing Coca-Cola Company, Gerber Products Company, Mott's LLP, Del Monte Corporation, Trader Joe's Company, Welch Foods, Inc., The Hain Celestial Group, Inc., The J.M. Smucker Company, Dole Food Company, Inc., KFP International, Ltd., and Topco Associates, LLC); RJN, Ex. C (Reported Findings of Low Levels of Lead in Some Food Products Commonly Consumed by Children) ("Almost all the products FDA tested contained a small amount of lead, but in each case the level found was below FDA's current tolerable intake levels for lead). In other words, it is not clear that alternative juices exist.

11

**CONCLUSION**

Plaintiff's complaint is DISMISSED WITH LEAVE TO AMEND.  **Any amended complaint must be filed on or before August 2, 2012 and must plead facts that support standing to bring suit**.

**IT IS SO ORDERED.**

Dated: July 19, 2012

SUSAN ILLSTON
United States District Judge